U.S. SECURITIES AND EXCHANGE COMMISSION
By:  ANTONIA M. APPS
Regional Director
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
Tel:     (212) 336-1100

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
(Designated Local Counsel)
By: Matthew J. Mailloux
Assistant U.S. Attorney
970 Broad Street
Newark, New Jersey 07102
Email: matthew.mailloux@usdoj.gov
Tel:     (973) 645-2837

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | Civil Action No. |
| **Plaintiff,** | |
| **-against-** | **COMPLAINT** |
| **ELIYAHU WEINSTEIN, ARYEH L. BROMBERG, JOEL L. WITTELS, RICHARD M. CURRY, CHRISTOPHER J. ANDERSON, AND ALAA MOHAMED HATTAB,** | |
| **Defendants.** | |

Plaintiff U.S. Securities and Exchange Commission ("Commission"), for its Complaint

against Defendants Eliyahu Weinstein ("Weinstein"), Aryeh L. Bromberg ("Bromberg"), Joel L.

Wittels ("Wittels"), Richard M. Curry ("Curry"), Christopher J. Anderson ("Anderson"), and

Alaa Mohamed Hattab ("Hattab") (collectively, "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1. This action concerns a multi-million dollar Ponzi-like fraud scheme orchestrated by Defendant Eliyahu Weinstein—a twice-convicted fraudster—and carried out by Weinstein and his five co-Defendants.

2. In or about November 2021, Defendants Weinstein, Bromberg, and Wittels, through their entity Optimus Investments, Inc. ("Optimus"), began their fraudulent scheme to raise millions of dollars from investors purportedly to finance lucrative transactions involving Optimus's overseas purchase, distribution, and re-sale of in-demand healthcare products.

3. In January 2022, Defendants Anderson and Curry formed Tryon Management Group LLC ("Tryon") to raise capital to invest in Optimus's purported deals through Tryon's sale of short-term promissory notes to individual investors linked to individual purported Optimus deals ("Tryon Note" or "Tryon Notes").

4. From at least January 2022 through the present ("Relevant Period"), Defendants Weinstein, Bromberg, Wittels, Anderson, and Curry schemed to mislead investors and prospective investors regarding the profitability of purported Optimus deals in order to induce sales of the Tryon Notes and to convince existing noteholders to delay repayment of their notes and/or roll over their investment into other Optimus deals. Meanwhile, these same Defendants used investor funds for improper purposes, including to make Ponzi-like payments to earlier investors with later-invested funds.

5. Defendants Weinstein, Bromberg, and Wittels ("Optimus Defendants") initially concealed Weinstein's identity, and thus his criminal record, from Anderson and Curry as well as from Tryon's investors. But in late August 2022, Anderson and Curry learned of Weinstein's true identity and of additional fraudulent conduct by the Optimus Defendants regarding the

purported Optimus deals, and thereafter joined the Optimus Defendants in continuing the fraudulent scheme to raise money from investors. From that point forward, Anderson and Curry, together with the Optimus Defendants, worked together to raise additional funds and to persuade investors to delay repayment of their Tryon Notes, while hiding Weinstein's identity and Defendants' prior and continued fraudulent conduct.

6.     Defendant Hattab knowingly provided substantial assistance to the other Defendants in carrying out their fraudulent scheme.

7.     Hattab purported to broker certain of the Optimus deals, and he substantially participated in the other Defendants' fraudulent scheme by: initially hiding Weinstein's identity from Curry and Anderson; providing Anderson and Curry misleading information regarding at least one of the Optimus deals; and, from late August 2022 forward, joining his co-Defendants' continuing fraudulent scheme to hide Weinstein's identity from Tryon investors, misuse Tryon investor funds, and continue to raise funds from Tryon investors for improper purposes.

8.     Defendants' scheme defrauded at least 150 Tryon investors out of a total of at least $38 million.

## **VIOLATIONS**

9.     Through this conduct and as alleged further here, Defendants Weinstein, Bromberg, Wittels, Curry, and Anderson have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

10.     Through this conduct and as alleged further here, Defendants Weinstein, Bromberg, and Wittels aided and abetted Defendants Curry's and Anderson's violations of

Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5

thereunder, in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section

20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

11.    Through this conduct and as alleged further here, Defendant Hattab aided and

abetted the other Defendants' violations of Section 17(a) of the Securities Act, and Section 10(b)

of the Exchange Act and Rule 10b-5 thereunder, in violation of Section 15(b) of the Securities

Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

12.    Unless Defendants are permanently restrained and enjoined, they will again

engage in the acts, practices, transactions, and courses of business set forth in this complaint and

in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

13.    The Commission brings this action pursuant to the authority conferred upon it by

Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)]; and Exchange Act

Section 21(d) [15 U.S.C. § 78u(d)].

14.    The Commission seeks a final judgment: (a) permanently enjoining Defendants

from violating the federal securities laws this Complaint alleges they have violated; (b) ordering

Defendants to disgorge all ill-gotten gains or unjust enrichment received as a result of the

violations alleged here and to pay prejudgment interest, pursuant to Exchange Act Sections

21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)]; (c) ordering Defendants to pay

civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)]; and

Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Defendants

from serving as officers or directors of any company that has a class of securities registered

under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under

Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (e) permanently enjoining Defendants from directly or indirectly—including, but not limited to, through any entity owned or controlled by them—participating in the issuance, purchase, offer, or sale of any security, except that such injunction shall not prevent each from purchasing or selling securities for their own personal accounts; and (f) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

16.    Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged here.

17.    Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendants may be found in, are inhabitants of, or transact business in the District of New Jersey, and some of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District.

## DEFENDANTS

18.    **Weinstein,** age 48, resides in Lakewood, New Jersey. Weinstein led and directed operations at Optimus but hid his identity from its investors by using the alias "Mike Konig" and by not holding an official title or documented ownership interest in Optimus. Weinstein thus hid from investors his two prior fraud convictions based on charges brought by the United States Attorney for the District of New Jersey. In January 2013, Weinstein pleaded guilty to fraud and

other charges involving a $200 million real estate Ponzi scheme and, on February 25, 2014, was sentenced to 22 years in prison and ordered to pay $224 million in restitution. In May 2013—while under indictment for his real estate fraud—Weinstein was charged for a separate, $6.7 million fraud involving purported sales of pre-IPO Facebook shares and Florida real estate. Weinstein again pleaded guilty and, on December 15, 2014, received another two-year prison sentence for the second fraud—bringing his total prison sentence to 24 years. In January 2021, President Donald J. Trump commuted both of Weinstein's sentences to time served. Weinstein has never been registered with the Commission in any capacity.

19.    **Bromberg,** age 48, resides in Lakewood, New Jersey. Optimus's New Jersey Certificate of Incorporation lists Bromberg and Wittels as comprising its "Board of Directors" and "Wittels" as its "Incorporator." Bromberg was primarily involved in raising capital for Optimus and in its strategy for communicating with Optimus investors. Bromberg has never been registered with the Commission in any capacity.

20.    **Wittels,** age 56, resides in Lakewood, New Jersey. Wittels was primarily responsible for Optimus's accounting and bookkeeping. Wittels has never been registered with the Commission in any capacity.

21.    **Curry,** age 36, resides in Northumberland, Pennsylvania. Curry co-founded Tryon with Anderson and, according to Tryon's New Jersey Certificate of Formation, the two served as Tryon's sole "Members" and "Managers." Curry was responsible for raising investor funds for Tryon, conducting due diligence into potential Tryon investments, and managing the funds that Tryon raised. Curry has never been registered with the Commission in any capacity.

22.    **Anderson,** age 47, resides in Readington, New Jersey. Anderson is the other co-founder of Tryon. Anderson was responsible for raising capital from Tryon investors, as well as

tracking Tryon's receipt and use of investor funds. Anderson has never been registered with the Commission in any capacity.

23.      **Hattab**, age 34, resides in Canada. Hattab's affiliated entities purportedly acted as brokers with suppliers on certain of the purported Optimus deals. Hattab has never been registered with the Commission in any capacity.

## RELATED PARTIES

24.      **Optimus** was incorporated in New Jersey in September 2021. Optimus purported to raise and deploy capital in the healthcare supply chain industry, including for example, purported transactions involving Covid-19 masks and first aid kits. Optimus purported to be operated by co-founders Bromberg and Wittels, but Weinstein actually led and directed its operations. Optimus has never been registered with the Commission in any capacity.

25.      **Tryon** is a limited liability company that Anderson and Curry formed in New Jersey in January 2022. Anderson and Curry are Tryon's sole co-founders and co-owners. Tryon has never been registered with the Commission in any capacity.

26.      **Cornerstone Trading Group, LLC ("Cornerstone")** is a limited liability company formed in New Jersey in May 2022. Cornerstone's New Jersey Certificate of Formation lists Bromberg, Wittels, Anderson, and Curry as its sole "Members" and "Managers." The Optimus Defendants, Curry, and Anderson formed Cornerstone ostensibly to receive, consolidate, and better track Optimus and Tryon investor funds. Cornerstone has never been registered with the Commission in any capacity.

## FACTS

### A.    Background

27.    In or about 2017-2018, Anderson and Curry met and became real estate business partners. Curry, who previously had worked as a medical supply wholesaler, also continued to operate in that business.

28.    In or around July 2021, Curry became acquainted with Wittels and invested his personal funds in a purported Wittels deal involving personal protective equipment. Wittels subsequently persuaded Curry to reinvest his purported profits from that deal into additional deals.

29.    In or about November 2021, Wittels introduced Bromberg to Curry as Wittels' business partner in Optimus which, the two represented to Curry, had been formed to engage in medical supplies distribution deals.

30.    By in or about January or February 2022, Anderson and Curry learned from their interactions with the Optimus Defendants that Weinstein (then using the alias "Mike Konig") was the go-to person behind the Optimus deals, and that Wittels and Bromberg relied on Weinstein (then "Mike Konig") to direct and carry out Optimus's purported deals.

31.    Throughout the Relevant Period, the Optimus Defendants sought and obtained financing for their purported deals from various investors, including Curry, Anderson, and Tryon.

32.    By at least January 2022, Bromberg and Wittels represented to Curry that Optimus needed capital to engage in new deals, and they offered to pay Curry a portion of the profits on such deals in exchange for Curry raising capital for Optimus.

33.     In or around January 2022, Curry and Anderson established Tryon as an investment vehicle through which to raise cash to fund the purported Optimus deals that Bromberg and Wittels were offering.

34.     Beginning in or about January 2022, and throughout the Relevant Period, Anderson and Curry had oral understandings with Bromberg and Wittels that Tryon was to receive 35% of Optimus's returns on each of the Optimus deals for which Tryon provided funding.

35.     During the Relevant Period, the Optimus Defendants pitched the purported Optimus deals to Anderson and Curry as follows. Optimus was to arrange funding for acquiring medical supplies overseas—such as Covid-19 test kits, face masks, and first aid kits—which would then be re-sold to a contracted purchaser at a profit. Optimus was to use those profits, in turn, to pay Tryon and other Optimus investors the promised returns on their investments.

36.     During the Relevant Period, through Anderson's and Curry's sales of the Tryon Notes, they raised funds for the Optimus deals directly from investors and collectively became the main source of Optimus's capital.

37.     The Tryon Notes varied but generally included these terms: the "Borrowers" (Anderson, Curry, and Tryon) agreed to pay the "Lender" (the noteholder), within 60-90 days, the note's principal loan amount plus interest at an annualized rate of 20% to 50%, as well as an "equity return" (*i.e.*, another percentage of the loan amount, typically up to 10%).

38.     During the Relevant Period, Curry and Anderson pitched the Tryon Notes to potential investors, and Anderson was responsible for drafting the Tryon Notes and maintaining any related documentation and bookkeeping.

39.    Curry and Anderson pitched each set of the Tryon Notes to prospective investors both orally and through written communications.

40.    In pitching the Tryon Notes to investors, Curry and Anderson generally represented that Tryon was offering the notes in order to fund a particular Optimus deal, including by describing the nature of the particular deal to be funded.

41.    For at least some, if not all, of the Tryon Note offerings, Anderson and Curry disseminated Tryon advertising materials that included the following flow chart, which indicated to prospective investors that the source of each Tryon Note holder's investment return was to be the anticipated return on the particular Optimus deal associated with that Tryon Note:



42.    Tryon's advertising materials also presented Anderson and Curry as "[f]amily [c]entric," "[f]aith-based" and "[m]en of honor" who provided access to "unique lending opportunities."

43.    Beginning in or about January 2022 and throughout the Relevant Period—based on their contemporaneous conversations with Anderson and Curry regarding Tryon's method of raising capital for Optimus—the Optimus Defendants knew that Tryon was raising capital for each of the purported Optimus deals through Tryon's offer and sale of Tryon Notes to individual investors; that generally each Tryon Note was linked to a particular purported Optimus deal; and that the Tryon investors expected to be repaid on their Tryon Notes with investment returns from each purported Optimus deal associated with each Tryon Note.

44.    Anderson and Curry typically collected and wired to Optimus the Tryon Note funds associated with each purported Optimus deal, with the expectation—based on their oral understandings with Bromberg and Wittels—that Optimus would then use each such pool of capital to fund each associated Optimus deal and would, in turn, pay Tryon its investment return on each such Optimus deal.

45.    By at least February 2022, Anderson and Curry knew that the Optimus deals were not yielding the promised investment returns, but they continued to pitch additional deals to investors.

46.    In or around late May 2022, Anderson, Curry, Bromberg, and Wittels formed Cornerstone, ostensibly to better track and account for Tryon investor funds and Anderson's and Curry's expected investment returns on the purported Optimus deals.

47.    Although Weinstein—then going by "Mike Konig"—declined to be a named partner in Cornerstone, he continued to hold himself out as running the purported Optimus deals and had direct or indirect access to Cornerstone's bank account.

48.    During the Relevant Period, in furtherance of their fraudulent scheme, Defendants Weinstein, Bromberg, Wittels, Curry, and Anderson misled Tryon investors and prospective

investors regarding the progress and profits of a number of purported Optimus deals, including the examples described in paragraphs 49-88 below.

    **B.**    **Representative Optimus Deals**

    1.    <u>Pharmex Deal</u>

49.    In or about December 2021, Bromberg introduced Curry to a deal that the Optimus Defendants called "Pharmex" ("Pharmex Deal").

50.    For the Pharmex Deal, Bromberg told Curry that Optimus needed to raise $10 million for the purchase of 23 million N-95 face masks from a supplier in Turkey (in two tranches) to fill an existing purchase order from an Israeli distributor. Bromberg sought to have Curry raise $5 million for the Pharmex Deal and offered Curry a 40% return on any capital he raised for the Pharmex Deal.

51.    In December 2021, for the first tranche of the Pharmex Deal, Curry provided Optimus approximately $3.8 million—a significant portion of which Curry personally contributed, and the rest of which he raised from a small group of investors (who included Anderson).

52.    Curry promised all but one of his Pharmex Deal investors 35% returns within 60 days, or by mid-February 2022.

53.    In early February 2022—knowing that the Pharmex Deal had not yet yielded any investment return and to convince his investors to roll their investments over into another Optimus deal—Anderson and Curry misrepresented to their investors that the purported Pharmex Deal had been profitable.

54.    Thus, for example, on February 6, 2022, Anderson sent the following false email to investors regarding the first tranche of the purported Pharmex Deal:

> Congratulations, we did it. Not only did we assist Pharmex Corporation in serving their clients and improving public health in Israel, but we made a bunch of money doing it. I know at the beginning of this journey, the deal sounded to [sic] good to be true, once in a while though, fairy tales do come true. Many of you have rolled over your principal investment into the [Optimus] GSA deal. Thank you for your continued trust.

55.     As Anderson and Curry knew at the time, Anderson's February 6, 2022 email was false because Optimus had not yet paid any return on the Pharmex Deal, as evidenced by Curry's statement the next day, February 7, 2022, in a WhatsApp chat with the Optimus Defendants:

> Any chance if pharmex money doesn't come back in time optimus could spot the money for my investors?  It's only like 1.252mm without my profits…It would seriously be YUGE [sic] for me to be able to promise this.

56.     By misleading their Pharmex Deal investors, Anderson and Curry were able to persuade most of them to forgo payment of their purported (but fictional) investment returns and, instead, roll their investments into other Optimus deals.

57.     For Pharmex Deal investors who insisted on repayment of their investments, the Optimus Defendants, Anderson, and Curry created the false impression that Tryon was paying them back with Pharmex Deal profits while, in fact—as the Optimus Defendants, Anderson, and Curry knew—Anderson and Curry repaid them with unrelated funds that they borrowed from Optimus.

58.     Thus, on February 10, 2022, to repay Anderson's and Curry's investors on the Pharmex Deal, Bromberg caused Optimus to wire to Tryon $1,252,000—with the reference "Pharmex Return"—even though Curry and Bromberg knew those funds were not generated by the Pharmex Deal.

59.     In a February 23, 2022 WhatsApp exchange, Curry thanked Bromberg for providing the $1,250,000 to repay the Pharmex Deal investors, which both men knew was not generated by the Pharmex Deal:

Curry:          It means a LOT that Optimus scraped the money together to pay
                my investors… I really really appreciate that.

Bromberg:       Of course were [sic] a [expletive] team buddy.

60.    Throughout the Relevant Period, as the Optimus Defendants knew or recklessly

disregarded, Curry and Anderson continued to mislead their Tryon investors regarding the

success and progress of purported Optimus deals in order to convince them to forgo immediate

repayment on their investments and, instead, roll over their investments into subsequent

purported Optimus deals.

61.    Thus, for example, in a March 16, 2022 WhatsApp chat among Weinstein, Curry,

and Wittels concerning payouts due on the Pharmex Deal, Curry wrote, "we will work on getting

everyone to agree to roll over their money (they will not know that we won't see it for another 30

days :( ) but we're going to just figure it out on our end.  Mike [referring to Weinstein], what I

need from you is [a] list of all the deals we have on the table so I can pitch to my investors where

there [sic] money is going to be used (you can do this on the phone with me but writing it out is

helpful)."  Weinstein responded, "Ok, will do."

62.    In addition, in or about June 2022, Wittels sent misleading account statements to

non-Tryon Optimus investors—which Anderson helped Wittels prepare—that created the false

impression that the Pharmex Deal profits had been received when, in fact (as Wittels and

Anderson knew and had discussed among themselves) no profits from the Pharmex Deal had

been received.

2.    Baby Formula Deals

63.    In or about late May 2022, during a shortage of baby formula in the United States,

Weinstein and Bromberg proposed to Anderson and Curry a deal to purchase baby formula from

a supplier in Turkey, using Hattab as the broker on the transaction ("Formula Deal 1").

14

64.     In or around June 2022, Anderson and Curry sold an initial set of Tryon Notes to raise funds for Formula Deal 1.

65.     Hattab, through one or more of his affiliated entities, purported to act as a broker for Formula Deal 1.

66.     In or about June and July 2022—through his communications with Anderson and/or Curry regarding Formula Deal 1—Hattab understood that Anderson and Curry were raising, and had raised, funds from their investors to help finance Formula Deal 1 and that they had provided those funds to Optimus to help finance Formula Deal 1.

67.     In or around late July or early August 2022, Anderson and Curry began to attempt to raise money for a second Formula Deal ("Formula Deal 2") (collectively with Formula Deal 1, "Formula Deals").

68.     In preparing to solicit investors for Formula Deal 2, Curry and Anderson asked Hattab for proof that Formula Deal 1 had been completed.

69.     In a July 29, 2022 WhatsApp chat, Curry asked Hattab for a "screenshot" of payments to his bank account for Formula Deal 1 as proof that Formula Deal 1 had been completed and that Tryon (and its investors) would receive their expected investment returns for Formula Deal 1.

70.     Hattab responded on WhatsApp to Anderson's July 29 request by stating that he would send the screenshot "today."

71.     Later that same day, July 29, 2022, Hattab provided Weinstein a screenshot of a portion of one of Hattab's on-line bank account statements, which reported incoming wires of approximately $2.26 million ("Screenshot").

72.     Later that same day, July 29, 2022, Weinstein (using his alias "Mike Konig") sent Anderson the Screenshot.

73.     Hattab and Weinstein provided the Screenshot to Anderson and Curry to deceive them into believing that Tryon's investors would receive their expected investment return on the Formula 1 Deal from the $2.26 million that Hattab had received.

74.     In fact—as Hattab and Weinstein knew prior to July 29, 2022—Optimus and Hattab had not used Tryon investor funds to finance Formula Deal 1 (Weinstein had diverted those funds for other purposes), and Weinstein and Hattab did not intend to use any proceeds of Formula Deal 1 to repay Tryon or its investors.

75.     As of July 29, 2022, Hattab and Weinstein knew that Anderson and Curry had requested the Screenshot as proof of Tryon's anticipated payout on Formula Deal 1, and both knew or recklessly disregarded that Anderson and Curry would rely on such proof of Formula Deal 1 in order to pitch Formula Deal 2 to Tryon investors.

76.     On August 3, 2022, relying on the misleading Screenshot and other false information that Weinstein and Hattab had provided Anderson and Curry regarding Formula Deal 1, Anderson sent an email to a broker ("Broker") who was helping Tryon solicit new investors ("August 3 Email").

77.     Anderson's August 3 Email summarized Formula Deal 1—including Tryon's or Cornerstone's (fictitious) investment return on that deal—and Anderson attached to his email as proof the misleading Screenshot that Hattab and Weinstein had provided.

78.     Also in his August 3 Email—based on the false and misleading information that Weinstein and Hattab had provided regarding Formula Deal 1—Anderson pitched Formula Deal 2 to the Broker.

79.     On August 6, 2022, Anderson and Curry emailed Tryon investors an update touting Formula Deal 1 and pitching Formula Deal 2 ("August 6 Email"):

> We successfully completed our first formula deal with 4 x 28,200 800g Cans (4 Containers).  That's 112,200 cans of formula being distributed to families in Texas at fair prices.  Needless to say, we felt so good about this one, that we have another deal in the pipeline for 29 more containers.  And it is LIVE.  If you want in on this deal, Offering is 25% within 3-4 Months (Although we think it will be faster).  Funding on this is open from 8/08-8/19.  ACt [sic] now,… Only 4mm in funding room left!

80.     Anderson and Curry based the August 6 Email on the false and misleading information that Weinstein and Hattab had provided to them regarding Formula Deal 1.

81.     In fact, as Weinstein and Hattab knew—and as Anderson and Curry later learned—Optimus had not invested Tryon investor funds in Formula Deal 1, and Formula Deal 2 never actually occurred.

3.     Mask Deals

82.     In mid-May 2022, the Optimus Defendants, Curry, and Anderson launched a deal involving the purported purchase of 100,000,000 face masks from a certain vendor in Turkey ("Turkish Vendor"), and purported resale of the masks to a certain product distribution company ("Distribution Company") that, the Optimus Defendants told Anderson and Curry, was involved in many of the purported Optimus deals ("Mask Deal 1").

83.     For Mask Deal 1, Curry, and Anderson offered investors the option to purchase either four-month Tryon Notes at a 25% annualized rate of return, or seven-month Tryon Notes at a 50% annualized rate of return.

84.     A Tryon deal sheet for Mask Deal 1, which Anderson and Curry created and sent to potential investors, stated that Tryon needed to raise $6.6 million to complete full payment ($29 million) to the Turkish Vendor.

85.     By the end of May 2022, Anderson and Curry had raised approximately $3.2 million for Mask Deal 1 through the sale of Tryon Notes and had provided those funds to Optimus.

86.     In or around July or August 2022, the Optimus Defendants, Anderson, and Curry launched a second mask deal ("Mask Deal 2") (collectively with Mask Deal 1, the "Mask Deals"), pursuant to which masks again were to be supplied by the Turkish Vendor.

87.     For Mask Deal 2, Anderson, and Curry raised $4.4 million through the sale of Tryon Notes and provided those funds to Optimus to fund Mask Deal 2.

88.     As Anderson and Curry later learned, Weinstein did not use the Tryon Notes' proceeds raised for the Mask Deals to fund the Mask Deals; rather, Weinstein fraudulently diverted those funds, knowing that they were intended to fund the Mask Deals, and knowing that Anderson and Curry had sold Tryon Notes for that purpose. In late August 2022, Weinstein admitted to Curry and Anderson that he had diverted the funds, claiming to have instead made unrelated investments in the Turkish stock market.

C.     **Ponzi-like Payments to Investors**

89.     Throughout the Relevant Period, as part of their scheme to mislead investors regarding the success of the purported Optimus deals, the Optimus Defendants, Curry, and Anderson further schemed to conceal the failure of those deals by repaying Tryon and Optimus investors with loans from Optimus to Tryon and vice versa; by using later investor funds to repay earlier investors; and by simultaneously persuading many Tryon Note holders to forgo immediate repayment and, instead, roll their purportedly successful investments into new purported Optimus deals that involved, in at least some cases, the issuance of new Tryon Notes.

90.     For example, as explained in paragraphs 49-62 above, by at least February 2022, Anderson and Curry had begun to receive requests from Tryon Note holders for past due note payments regarding the Pharmex Deal and, because no payment on the Pharmex Deal had been received (and to avoid disclosing this fact to then-current and prospective investors), Anderson and Curry borrowed funds from Optimus to repay those Pharmex Deal investors who chose not to roll over their investments.

91.     In another example, in April 2022, Bromberg (with Wittels' knowledge and consent) asked Curry to transfer to Optimus several million dollars of Tryon investor funds so that Optimus could make payments due to its non-Tryon investors. Curry and Anderson did so despite knowing that such transfers contradicted Anderson's and Curry's promises to the Tryon Note holders regarding Tryon's use of their invested funds to invest in Optimus deals.

92.     Similarly, in mid-May 2022—to trick an investor into believing that a purported Optimus deal in which that investor had invested had been successful—Bromberg agreed to Curry's request to repay the investor using Optimus funds unrelated to the purported deal, and Bromberg falsely labeled the wire transfer with a specific Optimus deal name. In fact, as Bromberg and Curry knew, that purported Optimus deal had not yet paid any profits. Within a month of receiving that false and misleading wire payment, the same investor made additional significant investments in purported Optimus deals.

93.     Wittels participated in cycling Optimus and Tryon investor funds to mislead Anderson and Curry—and by extension, their Tryon investors—into believing that they were receiving profits from Optimus deals when, in fact, they were receiving later investors' money.

94.     Thus, for example, on May 3, 2022, Tryon wired Optimus $2.9 million that Tryon had raised from its investors to fund one of Optimus's purported deals. The next day, Wittels

wired $2.5 million to Tryon, falsely representing to Anderson and Curry that the $2.5 million constituted profits from the Pharmex Deal when, in fact, it came from the $2.9 million that Tryon had wired to Optimus the previous day.

95.     Similarly, in an August 3, 2022 WhatsApp chat—among Anderson, Curry, Bromberg, and Wittels—Anderson and Wittels discussed Optimus's need to make a $125,000 payment due to an Optimus investor related to a particular purported Optimus deal. That same day, Anderson and/or Curry caused Cornerstone to wire Optimus $125,000 unrelated to that deal and, seven days later, Optimus wired the investor the $125,000, with a wire memo (falsely) noting the purported corresponding Optimus deal in which the investor had invested.

     **D.**    **The Defendants Hid Weinstein's Identity**

96.     From the time that Curry and Anderson first became involved with Optimus, until late August 2022, the Optimus Defendants (and, for at least part of this period, Defendant Hattab) intentionally hid Weinstein's true identity from Anderson and Curry—and so from Tryon's investors and potential investors—referring to Weinstein solely by the alias "Mike Konig."

97.     To obtain Optimus deal information to provide to his investors, Curry initially communicated directly with Bromberg and Wittels through frequent WhatsApp chats and telephone calls.

98.     Beginning by at least January 2022, as Optimus's payments to Tryon on its purported deals began to be delayed and, consequently, as Curry and Anderson began to ask Bromberg and Wittels for more detailed information about the deals, Bromberg referred Curry to a "Mike Konig" (who, unbeknownst to Curry and Anderson, was actually Weinstein).

99.     At Weinstein's direction, Bromberg and Wittels described "Mike Konig" to Curry as a wealthy businessman whom Bromberg had known for 35 years, and who maintained relationships with Optimus's suppliers.

100.    Weinstein, Bromberg, and Wittels thus intentionally concealed from Curry and Anderson Weinstein's true identity and criminal history, and downplayed his lead role at Optimus.

101.    By at least March 2022, Curry and eventually Anderson regularly communicated directly, by telephone and WhatsApp chat, with Weinstein (pretending to be "Mike Konig"), Bromberg, and Wittels.

102.    As further explained at paragraphs 111-121 below, the Optimus Defendants and Hattab continued to hide Weinstein's true identity from Anderson and Curry (and, thus, from Tryon's investors) until late August 2022—at which time Anderson and Curry learned of Weinstein's true identity and agreed to continue to conceal it from Tryon's investors.

E.     **The Optimus Defendants, Curry, and Anderson Hid the Identity of a Second Felon Involved in Optimus Deals**

103.    In addition to hiding his own identity, Weinstein also hid from Anderson and Curry—and, thus, from Tryon investors—the true identity of a Weinstein business associate involved in certain of the Optimus deals, who was also a felon convicted for his involvement in a Ponzi-like scheme ("Felon").

104.    Early on in the Relevant Period, the Optimus Defendants informed Anderson and Curry of the Distribution Company, which, they claimed, was involved in many of the purported Optimus deals.

105.    Thus, in periodic Tryon newsletters and other communications with its investors, Anderson and Curry routinely referred to the Distribution Company as a critical component of the Optimus deals in which Tryon purportedly was investing the Tryon Note holders' funds.

106.    Also early on in the Relevant Period, the Optimus Defendants provided Anderson and Curry the name of their principal contact at the Distribution Company, who was the Felon.

107.    However, the contact name that the Optimus Defendants had provided to Anderson and Curry for the Felon was an alias; Weinstein was attempting to hide from Anderson and Curry the real identity of the Felon.

108.    By at least June 2022, Bromberg and Wittels also knew that the name that they had provided for the Felon was an alias, and that he was a felon.

109.    By June 2022, Curry and Anderson learned the true identity of the Felon.

110.    After June 2022, Anderson, Curry, and the Optimus Defendants nonetheless continued to hide the true identity of the Felon from Tryon's investors, for fear that disclosure of such information would end the Optimus and Tryon investment scheme.

**F.    Defendants Jointly Continued Their Fraudulent Scheme After August 2022**

111.    On or about August 22, 2022, Curry and Anderson had an in-person meeting with Hattab ("August 22 Meeting"), the ostensible purpose of which was to discuss a possible Tryon investment in Hattab's plastic bottle company, Saniton Plastic Co. ("Saniton").

112.    At the August 22 Meeting, Anderson and Curry initially proposed to Hattab that they invest into Saniton $30 million of Tryon's anticipated profits from its investments in the purported Optimus deals.

113.    Hattab, however, informed Anderson and Curry at the August 22 Meeting: that Tryon would not realize its expected profits from the Mask Deals and the Formula Deals; that,

rather than investing Tryon funds in those deals, Weinstein had diverted that money; that the "Mike Konig" with whom Anderson and Curry had been communicating was actually Weinstein, a twice convicted Ponzi-scheme fraudster; that no Tryon money had been invested in Formula Deal 1; that Weinstein had directed Hattab to provide Anderson and Curry the Screenshot for Formula Deal 1; and that the Screenshot (and Formula Deal 1) did not actually involve any Tryon investment.

114.    Hattab further proposed to Anderson and Curry at the August 22 Meeting that, if they agreed not to contact the FBI about Weinstein, Hattab would grant Tryon a 49% interest in Saniton and 70% of Hattab's Saniton profits.

115.    Hattab also informed Anderson and Curry at the August 22 Meeting that Formula Deal 2 was not an actual deal. Hattab nonetheless asked Anderson and Curry to continue to raise funds for Saniton from Tryon's investors, under the guise of raising funds for the fictional Formula Deal 2.

116.    On or about August 25, 2022, Anderson and Curry provided to Hattab $1.875 million that they previously had raised from Tryon investors for Formula Deal 2, with the understanding that Hattab would use those funds to finance Saniton, not Formula Deal 2.

117.    Hattab then arranged an August 26, 2022 in-person meeting among Anderson, Curry, Weinstein, Bromberg, and Hattab ("August 26 Meeting"), at which time Weinstein admitted to Anderson and Curry: his true identity; that he had provided Anderson and Curry fake bills of lading for the Formula Deals; that he had used the Tryon investor funds raised for the Mask 1 Deal to invest instead in Turkish stocks; and that he (Weinstein) had diverted other Tryon investor money into Optimus deals other than those for which the Optimus Defendants had promised Anderson and Curry they would employ those funds.

118.    During the August 26, 2022 Meeting, Anderson acknowledged to the others present that it was illegal for Tryon to use older investor funds—or unrelated Optimus funds—to repay Tryon Note holders, but that Tryon would need to continue to do so to avoid defaulting on $35 million in Tryon Notes that were coming due in October 2022.

119.    During the August 26 Meeting, Weinstein and Bromberg asked Anderson and Curry to continue the fraudulent scheme—to hide from Tryon and Optimus investors all of the above information about their and the Optimus Defendants' fraudulent conduct, and Weinstein, Bromberg, Hattab, Anderson, and Curry jointly agreed to do so.

120.    Shortly after the August 26, 2022 Meeting, Anderson and Curry further learned that Optimus had diverted over $1 million of Tryon investor funds that had been earmarked for a purported Optimus deal to instead purchase a home in Jackson, New Jersey. When Anderson and Curry confronted Weinstein, Bromberg, and Wittels with this information, Wittels admitted that he had purchased the home for Weinstein and his family using Tryon investor funds that had been earmarked for an Optimus deal.

121.    For the rest of the Relevant Period, notwithstanding what Anderson and Curry had learned about the Optimus Defendants' fraudulent conduct—*i.e.*, Weinstein's hidden identity, the falsified Optimus documents, and Optimus's misappropriation of investor funds—the Optimus Defendants and Anderson and Curry actively concealed those facts from Tryon's investors.

122.    Also during the rest of the Relevant Period, the Optimus Defendants in concert with Anderson and Curry continued to try to sell new Tryon Notes and to persuade existing Tryon Note holders to forgo immediate repayment, and instead, roll over their funds into new purported Optimus deals (that Defendants knew were fictitious). Beginning by at least the end of

2022, they also sought note modification agreements with existing Tryon Note holders whose notes had become past due.

123.     Additionally, Anderson and Curry continued to attempt to raise, and did raise, funds from Tryon investors under the false pretense of financing other purported Optimus Deals when, in fact (as Anderson, Curry, the Optimus Defendants, and Hattab knew), they intended to use, and did use, those funds to invest in Saniton.

124.     Thus, on or about September 15, 2022, Anderson and Curry sent Hattab $500,000 for Saniton that they had raised from Tryon investors after the August 22 Meeting. As Hattab knew from his discussions with Anderson and Curry, they had raised those funds under the false pretense that they would be invested in an Optimus deal, not Saniton.

125.     In an October 20, 2022 WhatsApp chat with Bromberg, Curry stated, "I'm at the airport, will be trying to raise some money here as well to float"; and a few days later, on October 23, Curry wrote to Bromberg, "I slept for 12 hours straight the first night, and then proceeded to lie to all my investors, which was real fun."

126.     On or about October 24, 2022, Anderson and Curry sent Hattab another $300,000 for Saniton which, as Hattab knew, they had raised from Formula Deal investors, or an institutional lender, under the guise that the money was for an Optimus deal, not Saniton.

127.     In or around October or November 2022, Anderson and Curry sent Hattab $2 million, at least part of which, Hattab knew, they had raised for the Formula Deals—to use instead to finance an oil deal with Hattab and others unrelated to the Formula Deals.

128.     In a November 7, 2022, WhatsApp chat, Curry urged Weinstein to obtain bank loans to repay several million dollars in Tryon Notes that were coming due within two weeks, and further told Weinstein that Tryon would repay the loans by convincing Tryon investors to

"roll" their investments (meaning re-invest their initial investment) into a "year long [Tryon]

fund." The next day, Curry added, "we just have to cycle people's money in and back out," to

which Weinstein responded, "Understood."

129.    In a November 29, 2022, WhatsApp chat, Curry told Bromberg that he needed

$100,000 to re-pay a large Tryon investor, and Curry similarly urged Bromberg to lend Tryon

those funds and cycle the loan with new investor funds:

> just do what I do, send what's in your account, and backfill with what you raise, I
> used to do it all the time, when I had money, just please something. It will build
> so much momentum.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Defendants Weinstein, Bromberg, Wittels, Curry, and Anderson)

130.    The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 129.

131.    Defendants Weinstein, Bromberg, Wittels, Curry, and Anderson, directly or

indirectly, in the offer or sale of securities and by the use of the means or instruments of

transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly

have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly,

or negligently have obtained money or property by means of one or more untrue statements of a

material fact or omissions of a material fact necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading, and/or (3) knowingly,

recklessly, or negligently have engaged in one or more transactions, practices, or courses of

business which operated or would operate as a fraud or deceit upon the purchaser.

132.    By reason of the foregoing, Defendants Weinstein, Bromberg, Wittels, Curry, and

Anderson, directly or indirectly, have violated and, unless enjoined, will again violate Securities

Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Defendants Weinstein, Bromberg, Wittels, Curry, and Anderson)

133.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 129.

134.    Defendants Weinstein, Bromberg, Wittels, Curry, and Anderson, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

135.    By reason of the foregoing, Defendants Weinstein, Bromberg, Wittels, Curry, and Anderson, directly or indirectly, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)
### (Defendants Weinstein, Bromberg, and Wittels)

136.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 129.

137.    By engaging in the acts and conduct described in this Complaint, Defendants Weinstein, Bromberg, and Wittels, directly or indirectly, provided knowing and substantial assistance to Defendants Curry and Anderson, who, directly or indirectly, singly or in concert

with others, in the offer or sale of securities and by use of the means or instruments of

transportation or communication in interstate commerce or by use of the mails: (a) knowingly or

recklessly employed devices schemes, and artifices to defraud; (b) knowingly, recklessly, or

negligently obtained money or property by means of untrue statements of a material fact or

omissions of a material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and/or (c) knowingly, recklessly, or

negligently engaged in transactions, practices, or courses of business which operated or would

operate as a fraud or deceit upon purchasers of such securities.

138.    By reason of the foregoing, Defendants Weinstein, Bromberg, and Wittels are

liable for aiding and abetting Defendants Curry's and Anderson's violations of Section 17(a) of

the Securities Act [15 U.S.C. § 77q(a)] pursuant to Section 15(b) of the Securities Act [15 U.S.C.

§ 77o(b)] and, unless enjoined, Defendants Weinstein, Bromberg, and Wittels will again aid and

abet violations of these provisions.

**FOURTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Securities Act Section 10(b)**
**(Defendants Weinstein, Bromberg, and Wittels)**

139.    The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 129.

140.    By engaging in the acts and conduct described in this Complaint, Defendants

Weinstein, Bromberg, and Wittels, directly or indirectly, provided knowing and substantial

assistance to Defendants Curry and Anderson, who, directly or indirectly, singly or in concert, in

connection with the purchase or sale of securities and by the use of the means or

instrumentalities of interstate commerce, or the mails, or the facilities of a national securities

exchange, knowingly or recklessly (1) employed one or more devices, schemes, or artifices to

28

defraud; (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

141.    By reason of the foregoing, Defendants Weinstein, Bromberg, and Wittels are liable for aiding and abetting Defendants Curry's and Anderson's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] and, unless enjoined, Defendants Weinstein, Bromberg, and Wittels will again aid and abet violations of these provisions.

**FIFTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Exchange Act Section 10(b)**
**(Defendant Hattab)**

142.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 129.

143.    By engaging in the acts and conduct described in this Complaint, Defendant Hattab, directly or indirectly, provided knowing and substantial assistance to Defendants Weinstein, Bromberg, Wittels, Curry, and Anderson, who, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (1) employed one or more devices, schemes, or artifices to defraud; (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

144.    By reason of the foregoing, Defendant Hattab is liable for aiding and abetting Defendant Weinstein's, Bromberg's, Wittels', Curry's, and Anderson's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] and, unless enjoined, Defendant Hattab will again aid and abet violations of these provisions.

### SIXTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Securities Act Section 17(a)**
**(Defendant Hattab)**

145.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 129.

146.    By engaging in the acts and conduct described in this Complaint, Defendant Hattab, directly or indirectly, provided knowing and substantial assistance to Defendants Weinstein, Bromberg, Wittels, Curry, and Anderson, who, directly or indirectly, singly or in concert with others, in the offer or sale of securities and by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: (a) knowingly or recklessly employed devices schemes, and artifices to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of such securities.

147.    By reason of the foregoing, Defendant Hattab is liable for aiding and abetting

Defendant Weinstein's, Bromberg's, Wittels', Curry's, and Anderson's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and, unless enjoined, Defendant Hattab will again aid and abet violations of these provisions.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

### I.

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. §§77q(a)], and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering Defendants to disgorge all ill-gotten gains and/or unjust enrichment received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

### III.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### IV.

Permanently prohibiting Defendants from serving as officers or directors of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that

is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

**V.**

Permanently enjoining Defendants from directly or indirectly—including, but not limited to, through any entity owned or controlled by them—participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent each from purchasing or selling securities for their own personal accounts; and

**VI.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated:     July 19, 2023     U.S SECURITIES AND EXCHANGE
          New York, New York     COMMISSION
                                 By:
                               */s/ Antonia Apps*
                               Antonia M. Apps, Regional Director
                               Tejal Shah
                               Wendy B. Tepperman
                               Jack Kaufman
                               Teresa A. Rodriguez
                               Mary Kay Dunning
                               Laurel S. Fensterstock
                               U.S. SECURITIES AND EXCHANGE
                               COMMISSION
                               New York Regional Office
                               100 Pearl Street, Suite 20-100
                               New York, New York 10004-2616
                               (212) 336-0106 (Kaufman)
                               Email: KaufmanJa@sec.gov

Local Counsel for Plaintiff
PHILIP R. SELLINGER
UNITED STATES ATTORNEY (Designated Local Counsel)
By: Matthew J. Mailloux
Assistant U.S. Attorney
970 Broad Street
Newark, New Jersey 07102
Email: matthew.mailloux@usdoj.gov
Tel:    (973) 645-2837

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy alleged in the

foregoing Complaint is not the subject of any other civil action pending in any court, or of any

pending arbitration or administrative proceeding.


Dated:          July 19, 2023                    U.S. SECURITIES AND EXCHANGE
                New York, New York               COMMISSION
                                                 By:
                                                 */s/ Antonia Apps*
                                                 Antonia M. Apps, Regional Director
                                                 Tejal Shah
                                                 Wendy B. Tepperman
                                                 Jack Kaufman
                                                 Teresa A. Rodriguez
                                                 Mary Kay Dunning
                                                 Laurel S. Fensterstock
                                                 U.S. SECURITIES AND EXCHANGE
                                                 COMMISSION
                                                 New York Regional Office
                                                 100 Pearl Street, Suite 20-100
                                                 New York, New York 10004-2616
                                                 (212) 336-0106 (Kaufman)
                                                 Email: KaufmanJa@sec.gov

Local Counsel for Plaintiff
PHILIP R. SELLINGER
UNITED STATES ATTORNEY (Designated Local Counsel)
By: Matthew J. Mailloux
Assistant U.S. Attorney
970 Broad Street
Newark, New Jersey 07102
Email: matthew.mailloux@usdoj.gov
Tel:     (973) 645-2837

34

## <u>DESIGNATION PURSUANT TO LOCAL CIVIL RULE 101.1(f)</u>

Pursuant to Local Civil Rule 101.1(f), the undersigned hereby designates the United

States Attorney for the District of New Jersey to receive service of all notices or papers in this

action at the following address:

> Matthew J. Mailloux
> Assistant U.S. Attorney
> 970 Broad Street
> Newark, New Jersey 07102
> Email: matthew.mailloux@usdoj.gov
> Tel:       (973) 645-2837

Dated:      July 19, 2023                U.S. SECURITIES AND EXCHANGE
            New York, New York           COMMISSION
                                         By:
                                         _/s/ Antonia Apps_
                                         Antonia M. Apps, Regional Director
                                         Tejal Shah
                                         Wendy B. Tepperman
                                         Jack Kaufman
                                         Teresa A. Rodriguez
                                         Mary Kay Dunning
                                         Laurel S. Fensterstock
                                         U.S. SECURITIES AND EXCHANGE
                                         COMMISSION
                                         New York Regional Office
                                         100 Pearl Street, Suite 20-100
                                         New York, New York 10004-2616
                                         (212) 336-0106 (Kaufman)
                                         Email: KaufmanJa@sec.gov